SUTTON v. DAVID STANLEY CHEVROLET



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:SUTTON v. DAVID STANLEY CHEVROLET

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 SUTTON v. DAVID STANLEY CHEVROLET
2020 OK 87
Case Number: 117587; Comp. w/117588
Decided: 10/13/2020
As Corrected: October 21, 2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 87, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 



ISAAC SUTTON and CELESTE SUTTON, Plaintiffs/Appellees,
v.
DAVID STANLEY CHEVROLET, INC., Defendant/Appellant.

ON CERTIORARI FROM THE COURT OF CIVIL APPEALS, DIVISION IV

¶0 Plaintiffs, Isaac and Celeste Sutton, sued the defendant, David Stanley Chevrolet, Inc., concerning their purchase of a vehicle at the defendant's car dealership. The defendant moved to compel arbitration. The plaintiffs alleged they were fraudulently induced into entering the arbitration agreement. The trial court found there was fraudulent inducement and overruled the motion to compel arbitration. The Oklahoma Court of Civil Appeals, Div. IV, reversed the trial court and remanded for further proceedings concerning the unconscionability of the arbitration agreement. We previously granted certiorari. We hold the trial court's order finds full support in the evidence. The opinion of the Oklahoma Court of Civil Appeals is vacated and we remand to the trial court for further proceedings.

COURT OF CIVIL APPEALS' OPINION VACATED; ORDER OF THE TRIAL COURT AFFIRMED AND REMAND FOR FURTHER
PROCEEDINGS

James L. Gibbs, II, Goolsby, Proctor, Heefner & Gibbs, PC, Oklahoma City, OK, for Defendant/Appellant
M. Kathi Rawls and Minal Gahlot, Rawls Gahlot, P.L.L.C., Moore, OK, for Plaintiffs/Appellees


COMBS, J.:
I. FACTS AND PROCEDURAL HISTORY
¶1 On or about April 29, 2016, Isaac Sutton, plaintiff/appellee, (hereafter Sutton), went shopping for a vehicle at the defendant/appellant's, David Stanley Chevrolet, Inc., (hereafter DSC), car dealership. He agreed to purchase a 2016 Chevy Silverado on credit and he agreed to trade-in his 2013 Challenger. He was informed by DSC that his credit was approved. In addition, he was given $22,800.00 for the Challenger for which he still owed $25,400.00. The documents for the purchase of the vehicle amounted to approximately eighty-six pages. This included a purchase agreement as well as a retail installment sale contract (RISC). He left the dealership that evening with the Silverado and left his Challenger. Several days later he was informed by DSC that his financing was not approved and he would need a co-signor to purchase the Silverado. Sutton visited DSC but was then told he did not need a co-signor and there was no need to return the vehicle. At the end of June his lender for his 2013 Challenger contacted him about late payments. Sutton contacted DSC who said it was not their responsibility to make those payments since they did not own the Challenger he traded-in. A few days later, he was notified by DSC that his Challenger had been stolen and the matter was not the responsibility of DSC. Sutton had to make an insurance claim on his Challenger and DSC took back the Silverado. In the meantime, Sutton continued to make payments on the Challenger.
¶2 On February 24, 2017, Sutton and his wife filed a petition against DSC. They alleged DSC's failure to abide by the terms of its contract with Sutton negatively affected Sutton's health and financial situation and he has suffered actual, statutory, and consequential damages. Their causes of action include, fraud in the inducement to purchase the vehicle, conversion, violations of the Oklahoma Consumer Protection Act, breach of contract, negligence, and intentional infliction of emotional distress. On March 20, 2017, DSC filed a motion to compel arbitration based upon a Dispute Resolution Clause (DRC) which provided for arbitration and is found in the two-page purchase agreement. The plaintiffs filed a response on April 6, 2017, wherein they alleged the RISC contained a merger clause which provided it represented the entire contract and it contained no arbitration agreement. They also claimed Sutton's alleged agreement to the provisions of the DRC was fraudulently induced and the DRC's provisions were unconscionable. On June 14, 2018, the plaintiffs filed a motion for an evidentiary hearing concerning the motion to compel arbitration.
¶3 On October 4, 2018, the district court held an evidentiary hearing. Only Isaac Sutton testified at the hearing. Certain exhibits were also admitted into evidence, including the purchase agreement and a written declaration that Sutton had made which had been attached to the plaintiffs' response to the motion to compel arbitration. From the testimony and evidence admitted, Sutton explained, what appear to be, undisputed facts surrounding the purchase transaction. Sutton placed his signature on four separate signature lines found on the two-page purchase agreement. He agrees these are all his signatures and he was not forced into executing this document. The top of the purchase agreement contains the dealer name, Sutton's name, address and telephone numbers, as well as a date of April 29, 2016. It also lists the name of the salesman. Immediately below this information is a section titled "VEHICLE PURCHASED DESCRIPTION." It contains all relevant information including the vehicle identification number of the Silverado Sutton was purchasing. Underneath this section is a signature line. To the right of this section, is another section titled "PURCHASE PRICE DISCLOSURE." It contains the price of the vehicle as well as other information including the trade-in payoff amount and rebate. Underneath this section is a signature line. At the bottom of the page, in a much smaller font, is a section titled "SECURITY AGREEMENT." Immediately underneath this section is a signature line. Under the vehicle purchased description is another section titled "TRADE-IN VEHICLE." Like the vehicle purchase description, it contains vehicle information but it only concerns Sutton's Challenger he was trading-in. However, unlike the other sections of the purchase agreement, there is no signature line immediately following the trade-in vehicle section. In fact, what is immediately underneath this section, in a small red-colored font, is a "DISPUTE RESOLUTION CLAUSE." Underneath the DRC is the signature line. As mentioned, Sutton executed each of these signature lines.
¶4 From his testimony and declaration, Sutton stated the DSC finance manager showed him the purchase agreement and said that this document was for verifying his personal information, the vehicle information on both vehicles, and how much he would be paying. The finance manager went over Sutton's personal information, the vehicle information and pointed out the trade-in value as well as the rebate. The finance manager would hold the various documents in one hand and with the other he showed Sutton where he needed to sign. He would then take away the documents. At no time was the DRC discussed. On cross-examination Sutton was asked whether he read the DRC at the time he executed the purchase agreement. He replied he had not due to various reasons that will be discussed later in this opinion. The DRC provides that all matters under the DRC shall be submitted to binding arbitration pursuant to the Federal Arbitration Act (FAA), Title 9 U.S.C. §1, et seq. It also provides for the arbitrator's fee to be divided equally between the parties to arbitration. On direct examination, Sutton testified his family is on a tight budget and he would not have the money to pay any arbitration fees. If he was required to pay such fees he would have to find a new home.
¶5 The district court asked Sutton's attorney whether it was her position that when DSC's finance manager explained some of the terms of the purchase agreement and other documents, but without mentioning at all the dispute resolution clause, that that in and of itself is fraudulent inducement. She agreed that was her position. Defendant's counsel disagreed and said the finance managers' actions were not enough to constitute fraudulent inducement. In concluding the hearing, the district court stated "I'm going to rule consistent with what I ruled the other day, that I believe it is enough to get to fraudulent inducement. I'm not going to rule on the unconscionability issue." The issue of whether or not the RISC with the merger clause would defeat the purchase agreement's DRC was not discussed at the hearing or ruled upon by the court. On November 7, 2018, the district court issued an order. It states that after hearing Sutton's testimony, the evidence and arguments of counsel, defendant's motion to compel arbitration should be overruled. The order does not specify the grounds for denying the motion but it would appear from the court's statements at the hearing it was based upon fraudulent inducement.
¶6 On December 5, 2018, DSC appealed the order overruling their motion to compel arbitration. The appeal is one from an interlocutory order appealable by right. Okla.Sup.Ct.R. 1.60 (i); 12 O.S. 2011, § 1879. The matter was assigned to the Oklahoma Court of Civil Appeals, Div. IV. on April 17, 2019. On October 30, 2019, the court filed its opinion. The court noted:
A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.
Deardorf v. Rosenbusch, 1949 OK 117, ¶0, 206 P.2d 996 (Syllabus by the Court). The court agreed with DSC that Deardorf does not say that when one explains part of a written contract one must always then also explain or read aloud every other provision of the contract, including provisions unrelated to the portions of the contract discussed. It found the decision in Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165 (10th Cir. 2008) to be particularly accurate on this point. The court therein found, a "duty [to speak] could also arise, even though it might not exist in the first instance [one based upon fiduciary duty], once a defendant voluntarily chooses to speak to [a] plaintiff about a particular subject matter." Id. at 1180 (emphasis added). See also 37 Am. Jur. 2d Fraud and Deceit § 203 ("In general, once a person undertakes to speak, that person assumes a duty to tell the whole truth and to make a full and fair disclosure as to the matters about which the person assumes to speak." (emphasis added) (footnotes omitted)); 37 Am. Jur. 2d Fraud and Deceit § 204 ("[W]hen a party makes a disclosure upon a subject during negotiation, it has a duty to clarify the matter and ensure it is truthful[.]" (emphasis added)). The court noted, however, under our jurisprudence we have held "[w]here the peculiar circumstances give rise to a duty on the part of one of the parties to a contract to disclose material facts and the party remains silent to his or her benefit and to the other party's detriment, the failure to speak constitutes fraud." Croslin v. Enerlex, Inc., 2013 OK 34, ¶17, 308 P.3d 1041. But the court did not find any peculiar circumstances here. It found under the "particular circumstances" Sutton's allegations of fraud were based only on the finance manager mentioning and confirming the following matters in the purchase agreement: "Mr. Sutton's name, address, and phone number; the year, make, model and color of the vehicle being purchased; and the purchase price, including the negotiated value for Mr. Sutton's trade-in vehicle, and the rebate to be applied." The court's conclusion was bolstered by the fact that other contents of the purchase agreement were not discussed, such as the security agreement. It found if the finance manager was required by duty to read aloud or explain all of these provisions merely because he verified certain details it would "swallow[] up the time-honored rule that the plain, unambiguous terms of a written contract are binding on the parties." Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp., 24 F.3d 1190, 1195 (10th Cir. 1994) (applying Oklahoma law). It also noted our decision in Silk v. Phillips Petroleum Co., where this Court concluded a literate adult involved in an arms-length business transaction could not claim to be unaware of a provision in a written contract that was plainly captioned and separately signed by her, even though the provision, which she did not read, was not mentioned by the other party during contract discussions. 1988 OK 93, ¶¶22 & 34, 760 P.2d 174. The court then concluded, the trial court erred as a matter of law in holding there was enough evidence presented to find that fraudulent inducement occurred. The court reversed and remanded for further proceedings concerning the issue of unconscionability.
¶7 On November 11, 2019, the Suttons filed a petition for certiorari with this Court. We granted the petition on April 30, 2020. The matter was assigned to this office on May 2, 2020.
II. STANDARD OF REVIEW
¶8 Under the proceedings governing applications to compel arbitration, the existence of an agreement to arbitrate is a question of law. Rogers v. Dell Computer Corp., 2005 OK 51, ¶18, 138 P.3d 826. Questions of laws are reviewed de novo. Hill v. Blevins, 2005 OK 11, ¶3, 109 P.3d 332. A claim which attacks the enforceability of an arbitration provision itself, rather than just the existence of the contract in general, may be challenged in court. Signature Leasing LLC v. Buyer's Group LLC, 2020 OK 50, ¶3, 466 P.3d 544 (COMBS, J., concurring); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967). In Oklahoma state courts, the Oklahoma version of the Uniform Arbitration Act, 12 O.S. 2011, §1851 et seq., determines how proceedings on an application to compel arbitration shall be conducted so long as the Act does not frustrate the purposes underlying the FAA. See Rogers, 2005 OK 51, ¶15. Title 12 O.S. 2011, §1857 (A) provides:
An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract. (emphasis added).
Here, the Suttons specifically challenged the enforceability of the arbitration agreement contained in the purchase agreement's DRC based upon grounds that exist at law or in equity for the revocation of a contract, i.e., fraudulent inducement. This specific challenge as to the enforceability of the arbitration agreement itself, places the matter correctly in the district court.
III. ANALYSIS
¶9 The district court's order overruling the motion to compel is based upon Suttons' allegations of fraud in the inducement. Fraud is a generic term with multiple meanings and is divided into actual fraud and constructive fraud. Patel v. OMH Medical Center, Inc., 1999 OK 33, ¶34, 987 P.2d 1185. The district court did not specify whether her ruling was based upon actual fraud or constructive fraud.
¶10 Actual fraud is defined in 15 O.S. 2011, §58 and consists of any of the following acts, committed by a party to a contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.
2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true.
3. The suppression of that which is true, by one having knowledge or belief of the fact.
4. A promise made without any intention of performing it; or,
5. Any other act fitted to deceive.
Actual fraud is always a question of fact and must be proved at law. Croslin v. Enerlex, Inc., 2013 OK 34, ¶12, 308 P.3d 1041. It represents the intentional misrepresentation or concealment of a material fact which substantially affects another person. Patel, 1999 OK 33, ¶34. To constitute actual fraud, there must be an intentional deception. Faulkenberry v. Kansas City Southern Ry. Co., 1979 OK 142, ¶4, n.6, 602 P.2d 203, U.S. cert. denied, 464 U.S. 850, 104 S. Ct. 159, 78 L. Ed. 2d 146 (1983).
¶11 In contrast with actual fraud, constructive fraud does not require an intent to deceive. Gentry v. American Motorist Ins. Co., 1994 OK 4, ¶8, 867 P.2d 468. Constructive fraud is defined in 15 O.S. 2011, §59 and consists of:
1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,
2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.
Constructive fraud is a breach of either a legal or equitable duty and does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose. Patel, 1999 OK 33, ¶34; See Faulkenberry, 1979 OK 142, ¶4, n.6 ("Liability for constructive fraud may be based on a negligent misrepresentation. Even an innocent misrepresentation may constitute constructive fraud where there is an underlying right to be correctly informed of the facts."). It has been defined as "the concealment of material facts which one is bound under the circumstances to disclose." Bankers Trust Company v. Brown, 2005 OK CIV App 1, ¶14, 107 P.3d 609 (quoting Varn v. Maloney, 1973 OK 133, ¶18, 516 P.2d 1328).
¶12 Constructive fraud has the very same legal consequences as actual fraud.[1] Patel, ¶34. The court in Specialty Beverages, L.L.C.. faced a similar dilemma. It noted the pretrial order therein did not limit the plaintiff's fraud claim to a theory of constructive fraud, although the parties focused upon that theory. Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1182 (10th Cir. 2008). It found, however, that a theory under constructive fraud was specifically relevant to the facts of the case. Id. at 1180. Here, although the order overruling the motion to compel arbitration does not specify a particular theory of fraud, we find the theory of constructive fraud to be specifically relevant to the facts of this case.
¶13 Fraud has been described as:
"a generic term, which embraces all the multifarious means which human ingenuity can devise, and are resorted to by one individual to get an advantage over another by false suggestions or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. The only boundaries defining it are those which limit human knavery."
Van Winkle v. Henkle, 1919 OK 373, ¶8, 186 P. 942. In Griffith v. Scott, 1927 OK 361, ¶18, 261 P. 371, the Court quoted the following language concerning fraud and the evidence to establish it:
"Fraud may be proved by circumstantial evidence. Indeed, from its nature, it is difficult to prove it by direct evidence, and it is seldom that it can be so proved. Hence it is more often shown by circumstances than in any other way. It is impossible, however, to enumerate the facts from which it may be inferred. Each case must depend on its own facts, and all the facts and circumstances connected with and surrounding the transaction are to be considered together in determining whether it was fraudulent. Facts of trifling importance, when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very little but in connection with others make a strong case."
When fraud is alleged, every fact or circumstance from which a legal inference of fraud may be drawn is admissible. Berry v. Stevens, 1934 OK 167, ¶16, 31 P.2d 950. The gist of a fraudulent misrepresentation is the producing of a false impression upon the mind of the other party, and, if this result is accomplished, the means of its accomplishment are immaterial. Id., ¶15.
¶14 Constructive fraud may be defined as any breach of a duty which, regardless of the actor's intent, gains an advantage by misleading another to his prejudice. Patel, ¶34. When dealing with alleged omissions and partial disclosures, the first question is always whether there was a duty upon the actor to disclose the whole truth. A fiduciary relationship requires full disclosure of material facts. Barry v. Orahood, 1942 OK 419, ¶14, 132 P.2d 645. Where there is no fiduciary relationship a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction. Croslin v. Enerlex, Inc., 2013 OK 34, ¶17, 308 P.3d 1041 (discussing Barry, ¶10). In order that suppression of the truth may constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him. Barry, ¶13 (citations omitted). In other words, the facts concealed must be such as in fair dealing, the one party has a right to expect to be disclosed, and such as the other party is bound to disclose. Id. One may be under no duty to speak, but if he or she undertakes to do so, the truth must be told without suppression of material facts within his or her knowledge or materially qualifying those stated. See Berry, ¶0 (Syllabus by the Court). Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false. Id. Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract to disclose material facts and the party remains silent to his or her benefit and to the other party's detriment, the failure to speak constitutes fraud. See Croslin, ¶17, (discussing Morris v. McLendon, 1933 OK 619, ¶0, 27 P.2d 811 (Syllabus by the Court)).
¶15 A review of our jurisprudence in constructive fraud cases reveal a variety of facts and circumstances that will give rise to a duty to disclose material facts. We have consistently found the existence of the requisite circumstances, i.e., that which is necessary to create a duty to disclose, when the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party. In Deardorf v. Rosenbusch, Deardorf solicited to buy Rosenbusch's one acre mineral interests she owned in Oklahoma. 1949 OK 117, 206 P.2d 996. She was not living in Oklahoma at the time and when she purchased the mineral interest in 1934 for $350.00, the land was undeveloped. The two corresponded by letter but unbeknownst to Rosenbusch and known to Deardorf, the land now had one producing well with two others being drilled. In Deardorf's correspondence, he specifically mentioned that Rosenbusch had in 1934 acquired a nonproducing royalty interest but he never made any mention of the current production. In addition, he stated he was trying to clear title to a farm for a client and offered her $10 for a quitclaim deed which was included in his correspondence. Rosenbusch replied stating she hated to sell her interest for so little but because of her age she would probably not see any benefit in returns from her investment. She executed the quitclaim deed and sent it with her reply. The grantee on the deed was blank and was later inserted by Deardorf. The grantee, Reynolds, later instituted action against Rosenbusch to quiet title. Rosenbusch only discovered the later development on the property after she executed the quitclaim deed. She cross-petitioned Deardorf, alleged fraud, and prayed for the reasonable value of the mineral interest. The trial court ruled in favor of Rosenbusch.
¶16 On appeal, this Court quoted the following from Berry v. Stevens, 1934 OK 167, ¶20, 31 P.2d 950:
A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.
Deardorf, 1949 OK 117, ¶8. We held the offer to buy the mineral interest was fraudulent because it created a false impression that there was no production of minerals on the land. Id., ¶6. Because of the false impression created by Deardorf, a duty arose for him to tell the truth when he began the negotiations. Id., ¶¶6-8. "And on disclosing in part the pertinent facts such duty would be breached by withholding other pertinent truths." Id., ¶8. We held, the holding of the trial court that the deed was obtained by fraud finds full support in the evidence. Id., ¶9.
¶17 In Berry v. Stevens, Berry owned land in Caddo County and had previously lived there. He later moved to Craig County. He was acquainted with Stevens who owned a real estate business in Caddo County. Stevens wrote Berry concerning his property. Berry replied that he would like to sell his property. Stevens indicated he might be able to find a purchaser for the property; however, upon receiving Berry's reply, Stevens made an arrangement with two other men for the three to purchase Berry's property together. Berry was not told of this arrangement. Prior to this time various operators for oil and gas in the vicinity of Berry's property had discovered a new and deeper oil-bearing sand. But only just recently had a new and large oil well come in which was producing 1,000 barrels a day. Berry knew about the discovery of the deeper oil-bearing sand but did not know about the new oil well. Stevens arranged to visit Berry in Craig County on the pretense he had a client who was looking to purchase land there. The client was actually Steven's son-in-law pretending to be a client. They drove to Craig County and met with Berry. During this meeting Stevens made various statements to Berry about the different oil companies in the area of Berry's property and the size and production of the wells, as well as the discovery of the new and deeper sand. At no time did Stevens mention the new and large producing well. Berry agreed to sell his property and executed a deed. He was unaware that Stevens and his two associates were going to be the purchasers. Two days after executing the deed, Berry learned of the new and large producing well near his property. Berry filed an action against Stevens and his associates to rescind the contract and cancel the deed based upon the grounds of fraud. The trial court denied his petition and entered judgment in favor of the defendants. Berry appealed. On appeal, this Court found the "most potent contention made by the plaintiffs is that Stevens, while giving plaintiffs information as to the oil field in the vicinity of the lands involved in the action, gave them only such information as they already had, at least in part, but that he did not disclose to them the existence of the large well that had come in from the new and deeper sand just a day or two prior to the purchase of their lands." Berry, 1934 OK 167, ¶18. We then quoted the following from our earlier opinion in Gidney v. Chappell, 1910 OK 216, ¶15, 110 P. 1099:
Although a party may keep absolute silence and violate no rule of law or equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth. A partial statement, then, becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation.
Berry, ¶18. Concluding that half-truths calculated to deceive and representations literally true but used to create false impressions are actionable, we reversed the judgement of the trial court and remanded the matter for a new trial.
¶18 In Croslin v. Enerlex, Inc., W.M. Croslin, owned a four net acre mineral interest in Seminole County at the time of his death in 1994. In 2000, his unleased mineral interest was included in an Oklahoma Corporation Commission pooling order. His wife later died in 2005 and was survived by their children, the plaintiffs. In 2008, nearly $10,000.00 had accrued from the production of the unleased mineral interest under the pooling order and had been transmitted to the State for the benefit of W.M. Croslin. The defendant, Enerlex, knew of the pooling order and solicited the plaintiffs to buy their mineral interest. They sent an offer letter to each plaintiff in 2008 which included a mineral deed and mentioned that two bank drafts totaling $1,350.00 would be paid after completion of the title examination. The letter also stated that upon receipt of the mineral deed, Enerlex would begin a title examination. Enerlex did not disclose the existence of the pooling order or the accrued mineral proceeds held by the State. The provided mineral deed also stated that "this transfer and assignment covers and includes that the grantee shall have, receive, and enjoy the herein granted undivided interests in and to all royalties, accruals and other benefits, if any, from all Oil and Gas heretofore or hereafter run." Croslin, 2013 OK 34, ¶5. Without knowledge of the pooling order or accrued mineral proceeds held by the State, the plaintiffs executed the mineral deeds. They later discovered the pooling order and accrued mineral proceeds and filed suit against Enerlex for rescission and damages. They alleged the defendant had a duty to disclose this information and failure to do so amounted to constructive fraud. The trial court granted summary judgment in favor of the plaintiffs. On appeal the Oklahoma Court of Civil Appeals (COCA) reversed the judgment of the trial court and we granted certiorari.
¶19 We vacated the opinion of COCA and affirmed summary judgment. In our analysis, we looked at two false impressions created by the defendant. Instead of disclosing the nearly $10,000.00 of accrued mineral proceeds the defendant chose to remain silent. However, the "if any" language in the mineral deed indirectly or directly created a false impression that the defendant did not know of any production or accruals. Id., ¶30. The plaintiffs relied to their detriment on this false impression. The language discouraged rather than encouraged the plaintiffs to make their own investigation into the mineral interest. Further, the language in the letter that Enerlex will begin their title examination after receipt of the mineral deed, discouraged the plaintiffs from doubting Enerlex's truthfulness through the false impression that the defendant had not investigated the ownership of the mineral interest. Id., ¶31. We determined the false impression created by the "if any" language "gave rise to a duty on the part of the defendant to disclose the whole truth, including all material facts about the accrual of the mineral proceeds." Id., ¶32. Our analysis relied heavily upon the principles expressed in Deardorf, which we found to be:
[W]here defendant is under a duty to say nothing or to tell the whole truth, defendant's duty to tell the whole truth may arise from partial disclosure and defendant conveying a false impression by disclosing some facts and concealing others is guilty of fraud in that the concealment is in effect a false representation that what is disclosed is the whole truth.
Id. (emphasis added). We held, the plaintiffs were entitled to summary judgment on the legal issue of defendant's disclosure duty as a matter of law. Id. "Before allowing defendant to benefit from the mineral deeds, equity can and will, under the circumstances of this case, cause to be done what defendant was obligated to do." Id., ¶36 (emphasis added).
¶20 Under the circumstances of the present case, a duty arose to inform Sutton of the DRC. This is due to the false impression created by both the finance manager and the structure of the purchase agreement itself. The admitted evidence[2] showed the finance manager stated the purpose of the purchase agreement was for verifying Sutton's personal information, the vehicle information on both vehicles, and how much he would be paying. The finance manager would hold the purchase agreement in one hand and then point to the four signature lines that Sutton needed to sign with the other hand. Sutton executed the signature lines on the purchase agreement because of the representation he was only verifying information. The vehicle purchased description section contained information nearly identical to the trade-in vehicle section, and immediately below it was a signature line. The apparent purpose of this section was to verify the information on the vehicle he was purchasing. The purchase price disclosure section contained information concerning the price of the vehicle and immediately following it was a signature line. The apparent purpose of this section was also to verify the information on pricing. The trade-in vehicle section contained information on the vehicle he was trading-in. As with the other sections of the purchase agreement, his impression was that his signature was needed only for the purpose of verifying this information. However, unlike these other sections of the purchase agreement, a totally unrelated provision is tucked-in right before the apparent signature line for the trade-in vehicle section. This unrelated provision is the DRC which is in a much smaller font size. When questioned several times at the evidentiary hearing as to why Sutton did not read the DRC he answered:
Because the part that was pointed out for the signature was my trade-in and the VIN and the mileage on my trade-in.
Because what was pointed out in that paragraph was that it was my trade-in value, I made sure all that was correct and then I signed it.
I verified what he had pointed out, which was the 2013 Dodge Challenger, and the amount they were going to give for the trade-in value and how much was owed on it and then I signed it.
Here, the representations of the finance manager combined with the structure of the purchase agreement created a false impression that the purpose of Sutton's signature was to only verify information concerning his trade-in vehicle. He surely was not under the impression he was agreeing to waive his right to a jury trial and obligating himself to pay a share of the costs of arbitration when he signed underneath the trade-in vehicle section of the purchase agreement. The DRC which provided for arbitration was a material provision of the purchase agreement. Because of the creation of the false impression which shrouded the existence of the DRC, a duty to disclose this material provision arose.
¶21 It is no defense here that Sutton did not read the DRC provisions. In Dusbabek v. Bowers, 1934 OK 594, 43 P.2d 97, we found the following quote from the Appellate Court of Indiana to be instructive:
Every man or woman, even though illiterate, is presumed to know the contents of a written instrument signed by him; but no presumption of knowledge will stand in the way of a charge of fraud made in regard to the contents of the writing. No doubt it would be imprudent, in a sense, not to read or to require the reading of an instrument before signing or accepting it; indeed the courts would turn a deaf ear to a man who sought to get rid of a contract solely on the ground that its terms were not what he supposed them to be. But the courts would not refuse to listen, on the contrary they would give relief, where a plaintiff charged fraud upon the defendant in reading the contract to him, or in stating its nature or terms; and also in leaving out terms agreed upon, or in inserting terms not agreed upon. This would obviously be true of cases in which the complaining party could not read, or could read only with difficulty, or in which a printed document was concerned containing much fine print. But the rule is not confined to such cases; on the contrary it is very general.
Id., ¶34 (emphasis added) (quoting from Cole v. McLean, 93 Ind. App. 526, 177 N.E. 348, 350 (1931)).[3] Likewise, in Uptegraft v. Dome Petroleum Corp., 1988 OK 129, 764 P.2d 1350 we found an early Kansas opinion to be instructive on this point:
It is sufficient for present purposes to say that one who has misled another by a fraudulent misrepresentation cannot escape the ordinary consequences of his wrong by showing that, although his victim in fact knew nothing of the matter, knowledge was to be imputed to him upon some legal theory.
Id., ¶13 (quoting Int'l Harvester Co. of Am. v. Franklin Cty. Hardware Co., 101 Kan. 488, 167 P. 1057, 1058 (1917)). And, in rejecting constructive knowledge as a defense, the Uptegraft Court again quoted from the Kansas opinion:
The policy of the courts is, on the one hand, to suppress fraud, and, on the other, not to encourage negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable, and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked....
Uptegraft, ¶13. In conclusion, from the circumstances presented which created a false impression concerning the DRC, we hold the finance manager was under a duty to disclose this material information to Sutton and Sutton's failure to read the finely printed DRC is no defense here against establishing such duty.
¶22 We have no doubt that Sutton relied upon the false impressions made and the failure to disclose the DRC when he signed under the trade-in vehicle section. Nor do we have any doubt that Sutton was prejudiced under these circumstances to the advantage of DSC. Sutton unknowingly gave up his right to a jury trial. In addition, he testified that if he had to pay a share of the arbitration costs it would put him out of home. DSC certainly received an advantage, i.e., to forgo a potential jury trial and to have certain costs of arbitration paid by the customer.
¶23 The Oklahoma Court of Civil Appeals held there was no duty on the part of the finance manager to disclose any information because the DRC was never discussed and therefore there was nothing upon which a false impression could have been made regarding dispute resolution. It noted, another provision in the purchase agreement was also not discussed, i.e., the security agreement section. The court determined to hold otherwise would require the finance manager to read aloud or explain all of the provisions of the contract just because he verified certain details. The court, however, did not focus on the combination of the representations made by the finance manager in relation to the structure of the purchase agreement. The duty to disclose here is not a duty to read an entire contract; it is the duty to disclose enough information that will clear the false impression created, which under the circumstances, only concerned the DRC. The plaintiffs did not assert they were fraudulently induced into signing the security agreement. However, unlike the trade-in vehicle section, the security agreement section contained one signature line that only concerned the security agreement. In Silk v. Phillips Petroleum Co., we noted how it would be difficult to argue one did not understand what they were signing when it was a separate rider, plainly captioned and separately signed. 1988 OK 93, ¶34, 760 P.2d 174.
IV. CONCLUSION
¶24 Based upon the specific facts of this case, we hold, under a theory of constructive fraud, the order of the trial court overruling the motion to compel arbitration, which was based upon her oral findings of fraudulent inducement, finds full support in the evidence. The opinion of the Oklahoma Court of Civil Appeals is hereby vacated and the order of the trial court is affirmed. This matter is remanded to the trial court for further proceedings consistent with this opinion.
COURT OF CIVIL APPEALS' OPINION VACATED; ORDER OF THE TRIAL COURT AFFIRMED AND REMAND FOR FURTHER PROCEEDINGS
¶25 Gurich, C.J., Kauger, Edmondson, Colbert and Combs, JJ., concur.
¶26 Darby, V.C.J., Winchester (by separate writing), Kane, and Rowe (by separate writing), JJ., dissent.

FOOTNOTES

[1] In Patel, the trial court granted a petition to vacate a judgment based upon fraud. Patel, 1999 OK 33, ¶33. The defendants argued in order for the vacation to succeed, all of the elements of actual fraud must be established, including an intent to deceive. Id. The order made no such findings. Id. This Court rejected the argument and held "constructive fraud has the very same legal consequences as actual fraud, such a restriction can no longer be considered a correct exposition of our statutory law." Id., ¶¶33 & 35.

[2] Plaintiff's Ex. 2., Transcript of Proceedings held October 4, 2018.

[3] The Syllabus of the Dusbabek Court in ¶0 also states:
Where a party seeks to enforce an instrument against the person who signed it, and the signer charges such person with fraud in inducing him to sign said instrument on account of false and fraudulent representations concerning the contents of such instrument, and where the person signing such instrument acts upon such positive representations of fact, notwithstanding the fact that the means of knowledge were directly at hand and open to the person signing such instrument, and where said representations are of the character to induce action upon the person signing said instrument, and, in fact, did induce the signing of such instrument, such inducement constitutes fraud and it is sufficient to vitiate such instrument, and it becomes immaterial whether the person signing such instrument was negligent in failing to use diligence or ordinary prudence to discover the falsity of such representation.




Winchester, J., with whom Darby, V.C.J. and Kane, J. join, dissenting:
¶1 Parties enter into arbitration agreements to resolve disputes more efficiently. Arbitration gives the parties the benefit of having a third party mediate a dispute outside of court; this form of dispute resolution results in speedy and less costly results. The United States Supreme Court emphasized that the national policy favored arbitration of disputes through the Federal Arbitration Act (FAA) when it recently vacated a decision from this Court holding an employment-agreement arbitration clause unenforceable. See Nitro-Lift Techs., L.L.C. v. Howard, 568 U.S. 17, 20 (2012). Despite this recent correction, the Court attempts to again thwart the FAA by striking down another arbitration clause.
¶2 Sutton went to David Stanley Chevrolet (DSC) to purchase a vehicle. DSC's finance manager gave him a purchase agreement to sign. The purchase agreement contained an arbitration clause that was in red ink located in the middle of the first page of the agreement. Sutton did not read the arbitration clause but signed immediately underneath it. This was a simple car deal. Yet the Court seizes on constructive fraud in executing the arbitration clause because a car dealership finance manager's omission--specifically failing to read or discuss with the buyers the arbitration clause in a purchase agreement.
¶3 The Court ignores two long-standing contract duties to create the result it reaches: (1) the duty to disclose, and (2) the duty to read when entering into a contract. The Court attempts to temper its holding by limiting it to the facts of this case, but that limitation is destined to fail. The Court's pronouncement here will have a profound impact on all contracts, even those that do not include an arbitration clause and not limited to real estate, commercial, construction, employment, and sales contracts.
¶4 The Court states that a duty arose for DSC to inform Sutton of the dispute resolution clause due to the finance manager's representations and the structure of the purchase agreement; both the representations and the purchase agreement created a "false impression which shrouded the existence of the [dispute resolution clause]." The Court's conclusion contradicts its long-standing precedent.
¶5 A duty to speak may arise from a partial disclosure, as the speaker is obligated to say nothing or tell the entire truth. Deardorf v. Rosenbusch, 1949 OK 117, ¶ 0, 206 P.2d 996. Specifically, this Court held:
One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.
Id. (emphasis added); see also Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1180 (10th Cir. 2008) (applying Oklahoma law) (explaining that such a "duty could . . . arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to [a] plaintiff about a particular subject matter") (emphasis omitted). DSC's finance manager said nothing about the dispute resolution clause; Sutton also did not inquire about it. The finance manager did not disclose some facts and conceal others. The finance manager, by saying nothing about the clause, did not create a false impression regarding the subject of dispute resolution. Instead, Sutton simply assumed, without reading the purchase agreement before him, that the finance manager's statements about verifying certain information constituted the entirety of the multi-page agreement.
¶6 The Court disregards that the purchase agreement had numerous other provisions that were not discussed. For example, DSC's finance manager did not discuss the security interest granted to DSC through the purchase agreement, the warranty provisions, or any of the 13 provisions on the back of the agreement. Under this Court's pronouncement today, DSC could have committed fraud by failing to discuss any of these provisions. Its decision is too far-reaching and creates uncertainty.
¶7 Further, Deardorf, 1949 OK 117, 206 P.2d 996, Berry v. Stevens, 1934 OK 167, 31 P.2d 950, and Croslin v. Enerlex, Inc., 2013 OK 34, 308 P.3d 1041, cited by the majority to support its finding of fraud all concerned a duty to disclose material facts underlying a transaction, not written contractual terms or obligations. Extending those cases to create a new rule that discussion of any contractual term or provision requires discussion of the entire contract runs contrary to existing precedent regarding the duty of individuals signing contracts to read them.
¶8 Established Oklahoma precedent is that if one can read and is not prevented from doing so, one has a duty to read the contract. See Silk v. Phillips Petroleum Co., 1988 OK 93, ¶ 34, 760 P.2d 174, 179 (concluding that "a literate adult" "involved in an arms-length business transaction" could not claim to be "unaware" of a provision in a written that was "plainly captioned" and "separately signed" by her, even though the provision in question, which she did not read, was not mentioned by the corporate agent during the parties' contract discussion). Even more, this Court recently held concerning an arbitration agreement, "[c]ourts presume that a buyer who had the opportunity to read a contract but did not is bound by the unread terms." Williams v. TAMKO Bldg. Prods. Inc., 2019 OK 61, ¶ 9, 451 P.3d 146, 151 (finding an arbitration agreement unenforceable because the plaintiffs did not have an opportunity to read the contract) (emphasis added). Sutton without question had the opportunity to read the dispute resolution clause.
¶9 More importantly, the dispute resolution clause was not hidden nor did the structure of the purchase agreement in any way create a false impression. The dispute resolution clause was the only provision in red ink, and it was located in the middle of the agreement. The heading in all capital letters stated "DISPUTE RESOLUTION CLAUSE." Sutton signed immediately beneath the clause. The dispute resolution clause was clearly marked, but Sutton chose not to read the provision.
¶10 The Court also takes issue that Sutton was prejudiced by "unknowingly" waiving his right to a jury trial. There is no question that the dispute resolution clause included a waiver of a jury trial. However, the issue of whether such a waiver is proper in an arbitration clause has already been decided by this Court. See e.g., Rollings v. Thermodyne Indus. Inc., 1996 OK 6, ¶¶ 33-36, 910 P.2d 1030, 1036 (holding that jury waiver in arbitration agreement found not to violate Okla. Const. art. 23, § 8 or art. 2, § 6 (access to courts)). The fact that Sutton did not read the dispute resolution clause does not amount to him being prejudiced by the implications of the clause.
CONCLUSION 
¶11 The Court has long-established duties for parties who draft contracts and those that sign contracts. Instead of balancing those duties, the Court creates a new duty for the contract drafter to discuss every provision of the contract to avoid committing constructive fraud. However, even if the contract drafter reads the entire contract, a signer can still claim fraudulent inducement because the signer understood the contract differently or not at all. Under either scenario, arbitration is thwarted. The Court has further eliminated the duty to read a contract for anyone signing a contract.
¶12 The parties in this matter desired to buy and sell a car. The purpose of the arbitration clause in the purchase agreement was to quickly settle any dispute that might arise from this transaction. If Sutton read the arbitration clause and did not want to sign it, he always had the option of going to another car dealership to purchase a vehicle. Yet Sutton chose to sign the arbitration clause without reading it, and this Court should not ignore Oklahoma precedent regarding Sutton's duty to read the contract. For these reasons, I respectfully dissent to the Court's decision.




Rowe, J., with whom Kane, J., joins, dissenting:
¶1 The majority concludes that the finance manager for David Stanley Chevrolet, Inc. (Appellant) committed constructive fraud by failing to adequately point out that the purchase agreement included a Dispute Resolution Clause (DRC). The majority holds that the finance manager's representation to Mr. Sutton (Appellee) regarding the purpose of the form purchase agreement, combined with its structure, gave Mr. Sutton the false impression that his four separate signatures were only to verify his personal information, the vehicle information for the trade-in and new vehicle, and the amount he was paying.
¶2 The three cases on which the majority relies all involved purchases of real property and extended contract negotiations during which the buyers did not disclose material facts regarding the property.[1] In each case, discovery of the fraud required the sellers to go outside the four corners of each deed.
¶3 In contrast, Mr. Sutton did not need to read anything outside the four corners of the purchase agreement; rather, the conspicuously labeled DRC was located immediately above one of the four lines on which he signed. Further, the DRC is the only paragraph printed in red in the entire two-page purchase agreement.
¶4 There is also no evidence Mr. Sutton was unable to read or to see the color differentiation of the DRC paragraph. The undisputed facts disclose Mr. Sutton had previously financed a vehicle. Based on similar facts and arguments in Silk v. Phillips Petroleum Co., 1988 OK 93, ¶ 34, 760 P.2d 174, we held there are "no peculiar circumstances that would give rise to a positive duty to point out or explain" a particular lease provision to a literate adult who had previously executed oil and gas leases.[2] (Emphasis added). As relevant here, the defendant in Silk explained some lease terms to the plaintiff but failed to inform her about the never-discussed option to renew clause.
¶5 Today, the majority places the distinguished burden of explaining a DRC upon a finance manager of a car dealership; a duty that would rightfully be more at home in a law office. The majority opinion specifically holds "the duty to disclose here is not a duty to read an entire contract; it is the duty to disclose enough information that will clear the false impression created, which, under the circumstances, only concerned the DRC."
¶6 Regrettably, today's decision will create uncertainty and negative repercussions for Oklahoma business owners and customers executing otherwise arms-length transactions with typically quick turn-around times. To avoid circumstances from which a duty to disclose material facts arises, it would appear the best course is for the customer to seek advice from an attorney, rather than impose a duty upon a car dealership finance manager.
¶7 Accordingly, I respectfully dissent.

FOOTNOTES

[1] Deardorf v. Rosenbusch, 1949 OK 117, 206 P.2d 996 (mineral interest owner learned about oil development after executing the conveyance); Berry v. Stevens, 1934 OK 167, 31 P.2d 950 (landowner unaware of nearby production, discovery of deeper oil source, or that real estate agent agreed with two other men to buy the property); Croslin v. Enerlex, Inc., 2013 OK 34, 308 P.3d 1041 (purchaser knew about but did not disclose to survivors of the deceased mineral interest owner about accrued production proceeds held by State; mineral deed language that assigned "all royalties, accruals and other benefits, if any" created false impression of purchaser's lack of knowledge).

[2] In Silk, the plaintiff admitted she did not read the lease document before signing it and that while she had signed the option to renew clause, she had not seen it. 1988 OK 93, ¶22. She testified the option was not taped to the bottom of the oil and gas lease when she signed it, unlike the lease introduced into evidence. Id. at ¶ 27. The plaintiff also testified the defendant had already marked the signature lines with an "X" and directed her where to sign. Id. at ¶ 28. On appeal, she alleged the defendant's failure to inform her of the existence of the option, after having undertaken the duty of informing her of the terms of the lease, constituted fraud. Id. at ¶ 32. The Court acknowledged the option was material to the leasing agreement and that silence as to a material fact is not necessarily, as a matter of law, equivalent to a false representation; there must have been an obligation to speak." Id. at ¶ 33. After its holding (quoted above), the Silk Court noted the parties were involved in an arms-length transaction and the plaintiff had not alleged a confidential or fiduciary relationship. Id. at ¶ 34. The Court then pointed out that "the plainly captioned option to renew clause was separately signed, making it difficult for the signing lessor to be unaware of the rider -- whether or not it was attached to the printed oil and gas lease." Id. Due to the lack of evidence of fraud, the Court reversed the verdict-based judgment in favor of the plaintiff.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2005 OK CIV APP 1, 107 P.3d 609, BANKERS TRUST COMPANY v. BROWN
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 93, 760 P.2d 174, 59 OBJ 1688, Silk v. Phillips Petroleum Co.
Discussed at Length
 1988 OK 129, 764 P.2d 1350, 59 OBJ 3128, Uptegraft v. Dome Petroleum Corp.
Discussed
 1994 OK 4, 867 P.2d 468, 65 OBJ 292, Gentry v. American Motorist Ins. Co.
Discussed
 1933 OK 619, 27 P.2d 811, 167 Okla. 68, MORRIS v. MCLENDON
Discussed
 1934 OK 167, 31 P.2d 950, 168 Okla. 124, BERRY v. STEVENS
Discussed at Length
 1919 OK 373, 186 P. 942, 77 Okla. 34, VAN WINKLE v. HENKLE
Discussed
 1910 OK 216, 110 P. 1099, 26 Okla. 737, GIDNEY v. CHAPPELL
Discussed
 1934 OK 594, 43 P.2d 97, 173 Okla. 53, DUSBABEK v. BOWERS
Discussed
 1973 OK 133, 516 P.2d 1328, VARN v. MALONEY
Discussed
 2005 OK 11, 109 P.3d 332, HILL v. BLEVINS
Discussed
 1996 OK 6, 910 P.2d 1030, 67 OBJ 399, Rollings v. Thermodyne Industries, Inc.
Discussed
 2005 OK 51, 138 P.3d 826, ROGERS v. DELL COMPUTER CORPORATION
Discussed at Length
 2013 OK 34, 308 P.3d 1041, CROSLIN v. ENERLEX, INC.
Discussed at Length
 1979 OK 142, 602 P.2d 203, FAULKENBERRY v. KANSAS CITY SOUTHERN RY. CO.
Discussed at Length
 2019 OK 61, 451 P.3d 146, WILLIAMS v. TAMKO BUILDING PRODUCTS INC
Discussed
 2020 OK 50, 466 P.3d 544, SIGNATURE LEASING LLC v. BUYER'S GROUP LLC
Discussed
 1927 OK 361, 261 P. 371, 128 Okla. 125, GRIFFITH v. SCOTT
Discussed
 1949 OK 117, 206 P.2d 996, 201 Okla. 420, DEARDORF v. ROSENBUSCH
Discussed at Length
 1999 OK 33, 987 P.2d 1185, 70 OBJ 1353, Patel v. OMH Medical Center, Inc.
Discussed at Length
 1942 OK 419, 132 P.2d 645, 191 Okla. 618, BARRY v. ORAHOOD
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 1851, Short Title
Cited
 12 O.S. 1857, Enforceability, Interpretation of Arbitration Agreements - Arbitration Proceeding During Dispute Over Agreement
Cited
 12 O.S. 1879, Appeals
Cited
Title 15. Contracts
 Cite
Name
Level

 15 O.S. 58, Definition of Actual Fraud
Cited
 15 O.S. 59, Definition of Constructive Fraud
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA